UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA-AMERICAN WATER
COMPANY,

NO. CIV. S-05-2295 LKK/JFM

     Plaintiff,

  v.                           O R D E R

UNITED STATES OF AMERICA,
DEPARTMENT OF THE AIR FORCE,

     Defendant.
_____/

    This suit arises out of contamination of groundwater at
Mather Air Force Base in Sacramento County, California ("Mather").
On March 15, 2006, plaintiff, California-American Water Company
("Cal-Am"), filed a first amended complaint against defendants, the
United States of America ("United States") and the United States
Department of the Air Force ("Air Force"), alleging seven causes
of action: (1) Cost recovery under the Comprehensive Environmental
Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.
§§ 9601 et seq.; (2) Implied contribution under CERCLA; (3)
Negligence; (4) Negligence Per Se; (5) Continuing Public Nuisance;

1

1 (6) Continuing Private Nuisance; and (7) Trespass.

2     Pending before the court is defendants' motion to dismiss

3 claims three through seven.

**I.**

**ALLEGATIONS OF THE COMPLAINT[1]**

6     Plaintiff, Cal-Am, is a public utility that provides water to

7 commercial and residential customers in the County of Sacramento.

8 Cal-Am purchased the water supply assets at issue in the instant

9 case from Citizens Utilities Company of California ("CUCC" or

10 "Citizens") in January 2002.

11     Cal-Am owns a parcel of real property located on Mars Way in

12 Sacramento County, California, Assessor's Parcel Number 068-0142-

13 027-0000, on which a drinking water supply well, known as the "Mars

14 Well," is located.  Before it was contaminated, the Mars Well was

15 an excellent source of drinking water, capable of producing water

16 at the rate of at least 690 gallons per minute ("gpm").  The Mars

17 Well is a component of Cal-Am's suburban system, through which Cal-

18 Am supplies water to residential and commercial customers in

19 eastern Sacramento County.

20     At all times relevant to this dispute, the Air Force owned and

21 operated the property known as Mather Air Force Base.  The Air

22 Force base consists of approximately 5,845 acres in the City of

23 Rancho Cordova in eastern Sacramento County, California.  As a

24 result of the operations conducted by defendants and/or during

25 _____

26     [1]  Allegations are derived from plaintiff's first amended complaint filed on March 17, 2006.

2

1    their ownership or operation of Mather, significant quantities of

2    hazardous substances were released into the soil and groundwater

3    at Mather, including carbon tetrachloride, tetrachloroethylene

4    ("PCE") and trichloroethylene ("TCE"). All of these chemicals are

5    hazardous substances and are carcinogens. Plaintiff alleges that

6    these substances have migrated in the groundwater to various off-

7    site locations and have contaminated and threaten to contaminate

8    the Mars Well.

9       In March 2000, the Central Valley Regional Water Quality

10   Control Board concluded in its comments on the Air Force's Draft

11   First Revision, Mather AFT Off-Base Water Supply Contingency Plan,

12   that "[p]umping of the Mars Well will draw contaminants from the

13   Mather plume toward the Mars Well and induce a downward vertical

14   gradient." Plaintiff avers that the Mars Well "cannot be safely

15   operated without exceeding [Water Quality Objectives] and

16   exacerbating plume migration."

17      In December 2002, Montgomery Wason Harza, an environmental

18   consulting firm working at Mather on behalf of the Air Force,

19   concluded in a report prepared for the Air Force Center for

20   Environmental Excellence that if the Mars Well were pumped

21   continuously at a rate of 400 gpm, the plumes of PCE and

22   and carbon tetrachloride originating at Mather would be drawn

23   towards the well in concentrations at or near applicable Maximum

24   Contaminant Levels (MCLs). Cal-Am is prohibited by California law

25   from providing drinking water to customers where such water

26   contains contaminants at levels in excess of the applicable MCL.

1    Due to the presence in the groundwater of hazardous substances
2    that were released at and from Mather, the demonstration of such
3    hazardous substances on the Mars Well, and the risk that continuing
4    to pump groundwater from the Mars Well could draw the Mather
5    contaminant plume to it and/or increase concentrations of hazardous
6    substances in that well while the Air Force undertakes to abate
7    such damage, Cal-Am has refrained from using the Mars Well to
8    supply water to its customers.

9    Plaintiff maintains that it has incurred costs to obtain
10   alternative water supplies, including the costs of constructing a
11   water storage tank and booster station, and other costs and
12   damages.  Cal-Am contends that these costs constitute recoverable
13   response costs under CERCLA.

14   Cal-Am has notified the Air Force of the detection of
15   hazardous substances in the water drawn from the Mars Well, and
16   that the loss of the well impaired Cal-Am's ability to supply water
17   to its customers.  The Air Force has failed and refused to provide
18   a temporary or permanent source of water to compensate for the loss
19   of use of the Mars Well, despite Cal-Am's repeated requests, both
20   orally and in writing, that it provide such a source.

21   As a proximate result of the releases of hazardous substances
22   at the Mather Base and of the contamination of the Mars Well, Cal-
23   Am has incurred costs related to obtaining alternative water
24   supplies, including costs related to constructing a 3 million
25   gallon water storage tank and equipment, which it jointly owns and
26   ////

1  shares with the County of Sacramento.[2]

2     Cal-Am has also incurred increased operational and maintenance

3  costs at the Mars Well.  Cal-Am incurred such costs, in part, as

4  a result of releases of hazardous substances from Mather for which

5  defendants are asserted to be legally responsible, and, in part,

6  on account of releases of hazardous substances from other

7  facilities for which Aerojet-General Corporation and McDonnell

8  Douglas Corporation are responsible.

9     On or about February 7, 2003, Cal-Am served the Air Force with

10  a Notice of Claim for damages, setting forth its claims for

11  compensation for the loss of the Mars Well and construction of the

12  Mather Tank.  Cal-Am is unaware of any response made on behalf of

13  the Air Force to this Notice of Claim, and is informed and believes

14  that the Air Force has not responded to it.

**II.**

**PROCEDURAL HISTORY**

17     Before filing its first amended complaint, which is at issue

18  in this motion, Cal-Am initially pled that contaminants had been

19  detected in the Mars Well as early as 1997.  Original Compl. at

20  ¶ 8; see also Kempster Dec. at ¶¶ 9 & 10 (regarding testing in

21  1999).  It also originally pled that by virtue of its purchase of

22  the well in 2002, it "received an assignment of [CUCC's] claims

---

[2]  Cal-Am has received partial compensation of its Mather Tank
construction costs from Aerojet and McDonnell Douglas Corporation
in the amount of $ 1.2 million, but defendants have failed and
refused to compensate Cal-Am for the balance or any portion
thereof.

1  against third parties, which assignment included claims against the

2  defendants relating to the groundwater contamination emanating from

3  Mather."  _Id_. at ¶ 3.  The Original Complaint couched the tank

4  construction and monitoring costs as being incurred by "Citizens

5  and Cal-Am."  Original Compl. at ¶ 15.[3]

6       Defendant explains that in late February, Cal-Am's counsel

7  contacted counsel for the United States and requested that the

8  United States delay filing any answer or motion to dismiss until

9  March 17, 2006, so as to accommodate counsel's vacation plans.  On

10  February 22, 2006, the parties discussed the request by telephone

11  and the United States additionally asked counsel to voluntarily

12  dismiss the case based upon the Assignment of Claims Act and the

13  FTCA statute of limitations.

14       Counsel for the United States further informed Cal-Am's

15  counsel that in 2000, CUCC had already made a claim with the Air

16  Force for the damages at issue in the instant action.  Furthermore,

17  Cal-Am asked for a tolling agreement, which the Air Force refused

18  to sign.  Cal-Am's counsel stated that he was unaware of either the

19  Assignment of Claims Act or the 2000 CUCC claim.

20       Because Cal-Am did not agree to the voluntary dismissal, the

21  United States informed Cal-Am's counsel that it would file this

22  motion on the agreed-upon date of March 17, 2006.  On March 15,

23

24       [3]  Apparently in response to the original complaint, the
    United States' counsel verbally provided citations to Cal-Am's
25  counsel relating to the Assignment of Claims Act and electronically
    provided counsel copies of the 2000 claim of CUCC, found at McCain
26  Dec., Ex. 1.

1    2006, Cal-Am filed its Amended Complaint.  In its Amended

2    Complaint, Cal-Am removed all references to the assignment of the

3    claim by CUCC.  Compare Original Compl. at ¶¶ 3, 5 & 15 with

4    Amended Compl. at ¶ 3, 5, & 12.  Cal-Am also omitted pertinent

5    facts relating to the statute of limitations, including the fact

6    that CUCC's well had trace levels of contaminants since at least

7    1997.  Original Compl. at ¶¶ 8-10.  Furthermore, it omitted the

8    fact that CUCC had closed the well years before Cal-Am purchased

9    it in 2002.  Compare Original Compl. at ¶ 13 with Amended Compl.

10   at ¶ 10.

11                              **III.**

12         **STANDARDS FOR DISMISSAL UNDER FED. R. CIV. P. 12(b)(1)**

13         It is well established that the party seeking to invoke the

14   jurisdiction of the federal court has the burden of establishing

15   that jurisdiction exists.  <u>KVOS, Inc. v. Associated Press</u>, 299 U.S.

16   269, 278 (1936); <u>Scott v. Breeland</u>, 792 F.2d 925, 927 (9th Cir.

17   1986).  On a motion to dismiss pursuant to Federal Rule of Civil

18   Procedure 12(b)(1), the standards that must be applied vary

19   according to the nature of the jurisdictional challenge.

20         If the challenge to jurisdiction is a facial attack, i.e., the

21   defendant contends that the allegations of jurisdiction contained

22   in the complaint are insufficient on their face to demonstrate the

23   existence of jurisdiction, the plaintiff is entitled to safeguards

24   similar to those applicable when a Rule 12(b)(6) motion is made.

25   The factual allegations of the complaint are presumed to be true,

26   and the motion is granted only if the plaintiff fails to allege an

1  element necessary for subject matter jurisdiction.  See 2A J.

2  Moore, J. Lucas & G. Grotheer, Moore's Federal Practice, ¶ 12.07

3  (2d ed. 1987); see also Eaton v. Dorchester Development, Inc., 692

4  F.2d 727, 731 (11th Cir. 1982); Williamson v. Tucker, 645 F.2d 404,

5  412 (5th Cir. 1981), cert. denied, 454 U.S. 897 (1981); Mortensen

6  v. First Fed. Sav. & Loan Ass'n., 549 F.2d 884, 891 (3d Cir. 1977).

7  A complaint will be dismissed for lack of subject matter

8  jurisdiction (1) if the case does not "arise under" any federal law

9  or the United States Constitution, (2) if there is no case or

10  controversy within the meaning of that constitutional term, or (3)

11  if the cause is not one described by any jurisdictional statute.

12  Baker v. Carr, 369 U.S. 186, 198 (1962).

13      If the challenge to jurisdiction is made as a "speaking

14  motion" attacking the truth of the jurisdictional facts alleged by

15  the plaintiff, a different set of standards must be applied.

16  Thornhill Pub. Co., Inc. v. General Tel. & Elec. Corp., 594 F.2d

17  730, 733 (9th Cir. 1979).  Where the jurisdictional issue is

18  separable from the merits of the case, the district court is free

19  to hear evidence regarding jurisdiction and to rule on that issue

20  prior to trial, resolving factual disputes where necessary.

21  Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983);

22  Thornhill, 594 F.2d at 733.  "In such circumstances '[n]o

23  presumptive truthfulness attaches to plaintiff's allegations, and

24  the existence of disputed material facts will not preclude the

25  trial court from evaluating for itself the merits of jurisdictional

26  claims.'"  Augustine, 704 F.2d at 1077 (quoting Thornhill, 594 F.2d

1   at 733).

2         However, where the jurisdictional issue and
      substantive issues are so intertwined that the
3         question of jurisdiction is dependent on the
      resolution of factual issues going to the
4         merits, the jurisdictional determination
      should await a determination of the relevant
5         facts on either a motion going to the merits
      or at trial.

6

7   Augustine, 704 F.2d at 1077 (citing Thornhill, 594 F.2d at 733-35;

8   5 C. Wright & A. Miller, Federal Practice & Procedure § 1350, at

9   558 (1969 & Supp. 1987)).   On a motion going to the merits, the

10  court must, of course, employ the standard applicable to a motion

11  for summary judgment.   Farr v. United States, 990 F.2d 451, 454 n.

12  1 (9th Cir. 1993), cert. denied, 510 U.S. 1023 (1993).

13      When a plaintiff is seeking to recover from the United States

14  on a damage claim purportedly assigned to it, to the extent the

15  claim is voided by the Assignment of Claims Act, the complaint is

16  subject to dismissal for lack of standing.   See Atlas Hotels, Inc.

17  v. United States, 140 F.3d 1245, 1247 (9th Cir. 1998); Westinghouse

18  Elec. Co., 56 Fed. Cl. 564, 568-569 (Fed.Cl. 2003).   Put simply,

19  if the injury for which the assignee seeks recovery is not his own

20  injury but that which was purportedly assigned to him, and this

21  purported assignment is void, the assignee has no injury in fact,

22  and thus lacks standing.   Westinghouse Elec. Co., 56 Fed. Cl. at

23  568-569.

24      For purposes of ruling on a motion to dismiss for lack of

25  standing, the plaintiff bears the burden of proof, consistent with

26  Rule 12(b)(1).   Steel Co. v. Citizens for a Better Environment, 523

1 U.S. 83 (1998)("The party invoking federal jurisdiction bears the

2 burden of establishing its existence."); <u>Wilbur v. Locke</u>, 423 F.3d

3 1101, 1107 (9th Cir. 2005).  When the government introduces facts

4 and evidence in support of its motion to dismiss for lack of

5 standing based on the Assignment of Claims Act, some courts have

6 converted the jurisdictional motion to a Rule 56 motion.

7 <u>Westinghouse Elec. Co.</u>, 56 Fed. Cl. at 568.

8      In the case at bar, the court considered various documents

9 outside of the pleadings, but the court is not required to convert

10 the motion to one for summary judgment.  Based on the parties'

11 papers and their arguments, it is clear that the relevant facts for

12 purposes of this motion, those which were obtained from documents

13 outside of the complaint, are largely undisputed.  <u>See</u> <u>McCarthy v.</u>

14 <u>United States</u>, 850 F.2d 558, 560 (9th Cir. 1988), <u>cert. denied</u>, 489

15 U.S. 1052 (1989) (On a motion to dismiss for lack of subject matter

16 jurisdiction, a district court may consider matters outside the

17 pleadings without converting the motion into one for summary

18 judgment under Fed. R. Civ. P. 56).

19                                **IV.**

20                              **ANALYSIS**

21      The United States moves to dismiss claims three through seven

22 of plaintiff's first amended complaint.[4]  In those causes of

23 _____

24      [4]  The government concedes that although the Anti-Assignment
Act bars Cal-Am from recovering all costs that CUCC incurred, "Cal-

25 Am's CERCLA claims [claims one and two] survives this Motion to
Dismiss."  It concedes that certain costs, such as the $25,000 Cal-
Am alleges it incurred for tank construction after it purchased the

26 well, are recoverable under CERCLA.  Repl. Br. at 14.  Thus, the

1   action, Cal-Am maintains that it has incurred damages and costs

2   related to contamination emanating from Mather Air Force Base.

3   Specifically, Cal-Am alleges that it has incurred costs in order

4   to obtain alternative water supplies, including the costs of

5   construction of a water storage tank and booster station, and

6   damages as a result of defendants' releases of hazardous

7   substances, and of defendants' failure and refusal to replace lost

8   water supplies.  While Cal-Am contends that these costs constitute

9   recoverable response costs under CERCLA, it acknowledges that

10   certain of its claims are brought pursuant to the Federal Tort

11   Claims Act, 28 U.S.C. §§ 2671-2680 ("FTCA").

12       The government urges dismissal of the action because it argues

13   that plaintiff lacks standing as to any non-CERLA claim.  It argues

14   that plaintiff seeks to recover from the United States on a damage

15   claim purportedly assigned to it, in contravention of the

16   Assignment of Claims Act, 31 U.S.C. § 3727.  In the alternative,

17   defendant argues that plaintiff's claims should be dismissed as

18   time-barred under the FTCA and because plaintiff has failed to

19   comply with the exhaustion of administrative claim requirements set

20   forth under the FTCA.

21       Below, I explain why causes of actions three through seven

22   must be dismissed pursuant to the Assignment of Claims Act and,

23   accordingly, why the court need not reach defendants' arguments

24   under the FTCA.

25   _____

26   court need not engage in any analysis as to claims one and two.

11

**A.   ASSIGNMENT OF CLAIMS ACT**

The case at bar involves the Assignment of Claims Act ("the Act"), which prohibits the assignment of a claim against the United States for property damage.  The Assignment of Claims Act provides that "a transfer or assignment of any part of a claim against the United States Government:

> . . . may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.  The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses.  The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment.  The certificate shall state that the official completely explained the assignment when it was acknowledged. . . .

31 U.S.C. § 3727(a) & (b); see also Atlas Hotels, Inc. v. United States, 140 F.3d 1245, 1246-1247 (9th Cir. 1998).  With limited exceptions, the requirements of the Assignment of Claims Act must be satisfied to transfer a valid claim against the United States.  See Segal v. Rochelle, 382 U.S. 375, 382 (1966); see also In re Freeman, 489 F.2d 431, 432-433 (9th Cir. 1973)("failure to comply with the Assignment of Claims Act renders the assignment null and void so far as the United States is concerned").

The Assignment of Claims Act is said to serve various purposes.  The Supreme Court has explained that "[i]ts primary purpose was undoubtedly to prevent persons of influence from buying up claims against the United States."  United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 373 (1949).  Other purposes include protecting the United States from making multiple payments of

claims, protection from having to investigate the alleged assignments, and protection from having to "deal with persons who were strangers to the damage and are seeking to enforce a claim which their assignors have forsworn." United States v. Shannon, 342 U.S. 288, 293 (1952).

The Assignment of Claims Act applies to voluntary assignments such as the one in the case at bar.[5] Aetna, 338 U.S. at 373-376. In Shannon, the High Court held that a conveyance of property is a voluntary assignment.  342 U.S. at 290; see also Cadwalder v. United States, 45 F.3d 297, 300-301 (9th Cir. 1995) (FTCA claim for property damage could not be assigned to subsequent purchaser of property); Westinghouse Elec. Co. v. United States, 56 Fed. Cl. 564, 570 (Fed. Cl. 2003), aff'd., 97 Fed. Appx. 931 (Fed. Cir. 2004) ("the sale of assets alone involves a voluntary transaction that falls within the scope of the Anti-Assignment Act).[6]

Plaintiff does not contend that it has complied with the requirements of the Assignment of Claims Act.  Rather, plaintiff asserts that it has suffered its own "injuries in fact."  First,

---

[5]  Although defendant cites primarily to the original complaint in support of the fact that CUCC assigned any claims it had against the government to Cal-Am, plaintiff concedes in its opposition brief that an assignment did occur and that it did initially file a suit based, at least in part, on this assignment. Opp'n at 6.

[6]  On the other hand, the statute does not affect transfers that occur by "operation of law."  Danielson v. United States, 416 F.2d 408, 410 (9th Cir. 1969).  Transfers by operation of law include "corporate mergers, consolidations, and reorganizations, where in essence [the party with standing to sue the government] continues with the same entity, but in a different form." Westinghouse Elec. Co., 56 Fed. Cl. at 569.

1  plaintiff claims that it does not bring suit to recover on claims

2  that CUCC was entitled to bring, but on other tank construction

3  costs, tank operation, maintenance and tax costs, and increased

4  monitoring costs.  Opp'n at 7.  Second, plaintiff maintains that

5  "these costs were incurred by Cal-Am and none were incurred by

6  Citizens," that is, these costs were not in existence at the time

7  of the sale, and that it will incur additional costs in the future.

8  Id.  Below, I explain why both arguments are unavailing.

9  **B.  CAL-AM ALLEGES IDENTICAL CLAIMS ASSERTED BY CUCC IN 2000**

10      I first address Cal-Am's contention that its claims against

11  the United States are wholly different from those that CUCC may

12  have had against defendants prior to the sale of CUCC's assets to

13  Cal-Am.  A comparison of Cal-Am's first amended complaint with

14  CUCC's 2000 claim letter to defendants makes clear that the claim

15  Cal-Am now seeks to recover on is the identical claim that CUCC

16  attempted to settle with defendants in 2000.  The damages asserted

17  by CUCC in 2000 and the damages now asserted by Cal-Am are also

18  identical.  Accordingly, the record does not support Cal-Am's

19  contention that "it does not bring suit to recover on claims that

20  CUCC was entitled to bring."

21      On April 4, 2000, CUCC sent a letter to the Air Force seeking

22  to negotiate a settlement of its damages due to the Mars Well

23  closure and requesting that the Air Force execute a tolling

24  agreement for CUCC's trespass, nuisance, and state and federal

25  claims.  McCain Dec., Ex. 1.  CUCC articulated that the closure of

26  the well was a result of "contamination released from Mather Air

1  Force Base."  The letter noted that CUCC first detected

2  tetrachloroethylene ("PCE") and trichloroethylene ("TCE") in water

3  samples collected in the well water.  CUCC sought costs related to

4  "replac[ing] lost water supplies," and increased monitoring costs

5  for the Mars Well itself.  Id.  CUCC characterized its damages as

6  follows:

> As a direct and proximate result of groundwater contamination
> associated with the Mather plumes, Citizens' ability to drill
> new wells within its service areas is severely limited,
> either by regulatory agencies or by inherent risk. . . .
>
> Citizens [CUCC] carefully evaluated the various alternatives
> to address the threat to its Suburban service area, and
> determined that the most cost effective approach in the short
> term to assure an adequate water supply was the construction
> of a 3.1 million gallon water storage tank, and a booster
> station to transport the water to Citizens' distribution
> system.  This will allow Citizens to pump the production
> wells that do not contain contamination at greater frequency
> and store the water for use during periods of peak demand, or
> if any production wells must be taken out of service.
>
> In addition to the damages incurred to replace lost water
> supplies, Citizens has also been forced to perform sampling
> at its wells at a far greater frequency because of the
> existence of the Mather Base plumes . . . .

18  Id., Ex. 1 at USAF00417.

19      These damages, according to CUCC, were "directly attributable

20  to the contamination released at Mather Base."  The Air Force

21  declined the offer.  Approximately two years later, in 2002, CUCC

22  sold its water system, including the tank and the dormant Mars Well

23  to Cal-Am.  As part of the transaction, Cal-Am received an

24  assignment of CUCC's claims against third parties, "which

25  assignment included CUCC's claims against the defendants herein

26  relating to the groundwater contamination from Mather."  Original

15

1  Compl. at 2.

2      On November 5, 2005, Cal-Am brought this action, alleging

3  nearly identical injuries based on the same wrongdoing on the part

4  of defendants.  That complaint was amended on March 16, 2006.  The

5  amended complaint, too, is nearly identical to the original

6  complaint, although it omits any reference to an assignment of

7  CUCC's claims.  As with CUCC, Cal-Am avers that its damages arises

8  out of "contamination of groundwater that is used by Cal-Am as a

9  source of drinking water."  As CUCC previously claimed, Cal-Am's

10  injuries arise out of groundwater by the very same contaminants,

11  PCE and TCE.  Compl. at 2-3.  Indentically with CUCC claim, Cal-Am

12  also alleges that its damages were incurred due to lost water

13  supplies, the cost of building a water storage tank and booster

14  station, and that it must sample its water supplies at a greater

15  frequency.  Compl. at 2.

16      Because Cal-Am has failed to identify a claim in causes of

17  action three through seven that is different from those previously

18  raised by CUCC, and because it failed to comply with the Anti-

19  Assignment Act, the court must dismiss claims three through seven

20  of Cal-Am's amended complaint.  The claims currently before the

21  court involve a voluntary transaction and the sale of assets which

22  fall precisely within the scope of the Anti-Assignment Act.

23  **C.  ASSIGNMENT OF FUTURE CLAIMS**

24      Second, I address plaintiff's contention that it has incurred

25  "costs and damages of its own," and that "it will surely incur

26  additional costs and damages in the future."  Opp'n at 7.

16

1   Plaintiff appears to make the argument that even though its damages

2   stem from the same cause, it may escape the breadth of the Anti-

3   Assignment Act because it suffers *future* damages which are

4   different from those incurred by CUCC.  Plaintiff's argument does

5   not lie.  The transactional documents in the sale of CUCC's assets

6   to Cal-Am demonstrate that the parties intended to assign to Cal-Am

7   all rights, both present and future, relating to the water supply

8   assets.[7]  Because the parties did not comply with the Anti-

9   Assignment Act, however, such rights are not a predicate for

10  recovery.

11      There is no specific language in the "Asset Purchase Agreement

12  which identifies and assigns CUCC's claims against the United

13  States Air Force to Cal-Am."  Cal-Am's Filing of Transactional

14  Docs. at 2.  Articles I and II of the Agreement, however, establish

15  that CUCC assigned to Cal-Am all rights, including future rights,

16  as they relate to the water assets.

17      Article I of the Agreement first establishes the term,

18  "Acquired Assets," as follows:

19          all of each Seller Party's right, title, and interest
            in, under and to all of the assets, properties and
20          rights exclusively used in the Business as a going
            concern of every kind, nature and description existing
21          on the Closing Date, whether such assets, properties and
            rights are located and whether such assets, properties
22          and rights are real, personal or mixed, tangible or
            intangible, and whether or not any of such assets,
23          properties and rights have any value for accounting

24  ────────────────────

25      [7]  On May 24, 2006, the court issued an order directing Cal-Am
    to file transactional documents in the sale of CUCC's assets to
26  Cal-Am "relating to CUCC's assignments of claims to Cal-Am
    involving groundwater contamination emanating from Mather."

purposes or are carried or reflected on or specifically referred to in Seller's books or financial's statements, including all of the assets, properties and rights exclusively relating to the Business enumerated below.

Attach. at p. 1, § 1.1.1.

The Agreement goes on to note that "Acquired Assets" includes "all water tanks, reservoirs, water works, plant and systems, purification and filtration systems, pumping stations, pumps, wells, mains, water pipes, hydrants, equipment, machinery, vehicles . . . and other tangible personal property . . . used exclusively in the Business."  Attach. 1 at p. 2, § 1.1.1(b).

"Acquired Assets" also includes "choses of action" and "claims" arising out of occurrences "before or after the Closing Date" and "exclusively related to any of the Acquired Assets . . . ."[8]  Attach. 1, at p. 3, § 1.1.1(j).[9]  Finally, the purchase

_____

[8]  "Choses of Action" refers to "a right of bringing an action or right to recover a debt or money" or "a right of proceeding in a court of law to procure payment of sum of money, or right to recover a personal chattel or a sum of money by action."  Black's Law Dictionary, Sixth Edition (1990).

[9]  § 1.1.1(j) provides that "acquired assets" includes:

all rights or choses in action arising out of occurrences before or after the Closing Date and exclusively related to any of the Acquired Assets, including third party warranties and guarantees and all related claims, credits, rights of recovery and set-off and other similar contractual rights, as to third parties held by or in favor of Seller; provided, however, that (notwithstanding the foregoing provisions of this Section 1.1.1(j)), to the extent that Seller pays or discharges a liability related to the Business or any of the Acquired Assets and related to such a right or chose in action (whether by reason of indemnification under the Agreement or otherwise), Buyer will reassign or reconvey to Seller such a right or

18

1  agreement contemplates that Cal-Am, "Buyer," would assume

2  liabilities specifically related to pollution "known or

3  unknown . . . ."[10]

4      Read together, these four provisions of the "Asset Purchase

5  Agreement" make plain that CUCC assigned to Cal-Am "all rights" or

6  "choses in action" which "aris[e] out of occurrences before or

7  after the Closing Date" as they relate to any of the "acquired

8  assets," including equipment related to the "water assets" and

9  equipment purchased by Cal-Am.   Attach. at p.3, § 1.1.1 (b), (j).

10  The agreement also explicitly provides that Cal-Am would assume

11  liabilities related to the property "known or unknown . . .

12  relating to arising from pollution, contamination or protection of

13  the environment . . . ."  Attach. at p.12, § 2.3.1(d).   In sum,

14  CUCC effectively assigned to Cal-Am any future rights or "choses

15  of action" that CUCC may have had against the United States

16  relating to contamination emanating from Mather Air Force Base.

17  ─────────────

18      chose in action to the extent that such a right or chose
        in action relates to a recovery of amounts paid to

19      buyer.

20      [10]   The Asset Agreement provides that:

21      "Buyer shall assume liabilities and obligations" for
        "any liability, obligation or responsibility of Seller

22      for conditions at the Real Estate, whether based on
        statutory or common law, now or hereafter in effect,

23      known or unknown, contingent or actual, relating to or
        arising from pollution, contamination or protection of

24      the environment, human health or safety or natural
        resources or relating to or arising from the presence or

25      Release or threat of Release of Hazardous Substances
        into the environment at the Real Estate . . . ."

26  Attach., p.12, § 2.3.1(d).

1    The assignability of future rights depends on local law.  In

2  re Freeman, 489 F.2d 431, 433 (9th Cir. 1973)(citing Danning v.

3  Mintz, 367 F.2d 304, 308 (9th Cir. 1966)).  Under California law –

4  the law applicable here – a future right can be assigned.  It

5  becomes operative at the time the right assigned comes into

6  existence or becomes recoverable, without any further act on the

7  part of the transferor, and relates back to the date of the

8  assignment.  Id. (citing Prudential Insur. Co. v. Broadhurst, 157

9  Cal.App.2d 375, 378 (1958)).  Accordingly, where, as here, CUCC

10 assigned to Cal-Am all present and future rights relating to

11 contamination emanating from Mather Air Force Base, the assigned

12 future right related back, and thus required compliance with the

13 Act.  "Failure to comply with the assignment of Claim Act renders

14 the assignment null and void so far as the United States is

15 concerned."[11]  Id. at 433.  In sum, Cal-Am's argument that it may

16 recover on future costs that were not incurred by CUCC fails

17 because the Asset Purchase Agreement contemplated the assignment

18 of future rights and because the plaintiff failed to comply with

19 the requirements of the Anti-Assignment Act, the cause of action

20

21       [11]   In In re Freeman, the Ninth Circuit explained that while
     failure to comply with the Anti-Assignment Act may render claims
22   as to the United States "null and void," such failure does not
     render the assignment void as between the parties.  489 F.3d at
23   433.  In re Freeman involved a wife who, as part of her divorce
     settlement, entered into an agreement where she would assign to her
24   husband any federal income tax refund due.  The court held that
     assignments of future interests were permissible under California
25   law so that the Assignment of Claims Act did not disturb the
     assignment void as between the husband and wife, even though it was
26   void as between the parties and the United States.

1   is barred.[12]

2                                  V.

3                            CONCLUSION

4        Defendant's motion to dismiss is GRANTED as to claims three

5   through seven.[13]

6        IT IS SO ORDERED.

7        DATED: June 15, 2006.

8

9                                  LAWRENCE K. KARLTON
                                   SENIOR JUDGE
10                                 UNITED STATES DISTRICT COURT

11

12

13

14

15
    _____

16       [12]  Accordingly, the court need not discuss arguments related
    to the FTCA and the applicable statute of limitations under state
17  law.  The parties discuss at length in their papers and
    supplemental briefs whether, under California law, a subsequent
18  purchaser with knowledge of the property's condition lacks standing
    to bring a tort claim for its own costs in repairing the pre-
19  existing condition of the property.  The court, however, need not
    reach these state law questions.  The court notes, however, the
20  Supreme Court has explained that application of the Anti-Assignment
    statute, with respect to voluntary assignments, may be applied to
21  preclude an action under the FTCA, the statute under which claims
    three through seven are brought.  See United States v. Shannon, 342
22  U.S. 288, 290 (1952).

23       [13]  Plaintiff is granted twenty-five (25) days to amend its
    complaint if it, in good faith, believes that it has claims against
24  the government in its own right - that is, claims different from
    those which CUCC was entitled to bring.  The court will not look
25  kindly upon amendments which fail to allege claims different from
    those previously asserted by CUCC in its 2000 letter to the Air
26  Force.

                                   21